Good morning, your honors. Michael Vanik, appearing on behalf of the Appellant's South Bay Trust and its trustees, Mr. Middleton, Mr. Doss, Ms. Raimlich, and Gary Neal. There are two basic issues on this appeal. One is a procedural issue, and the other is a substantive issue. The procedural issue is whether the district court erred in refusing to hear the Appellant's affirmative defenses after this case was remanded by the Ninth Circuit in Middleton 1. We believe it clearly has under the doctrine of law of the case and the rules mandate. The other issue is a substantive issue, is had it heard our affirmative defenses, should it have ruled in our favor? And we believe that the district court should have and that you can, because there is no triable issue of material facts with regard to those affirmative defenses, and you can rule on those affirmative defenses in our favor as a matter of law. Neither the law of the case nor the rule of mandate precluded the district court from determining the affirmative defenses, because there was never the affirmative defenses were never decided by any court prior to being back in the district court. Judge Rapitti in the initial district court ruling on summary judgment did not have those issues before him, and the Middleton court on the appeal from his judgment did not have issues, the affirmative defenses, in front of him. One of the things that's the premise or foundation for the rule of law and the rule of mandate is that there has been a hearing on the merits and a determination in order to be able to say that that's something that has already been decided and therefore the district court can no longer look at it. We just don't have that here. For some reason, Judge Rapitti allowed himself to be convinced that there was. But when you look at the circumstances, there's no circumstances from which the court could have concluded that the affirmative defense issues were actually considered and decided either expressly or implicitly. As I said, they were not part of the original district court summary. Well, in Middleton 1, did we, when I say we, the Ninth Circuit, even though I wasn't on the panel, did we need to decide South Bay's affirmative defenses to conclude that South Bay had breached its fiduciary duties? No, absolutely not. That's not an issue. It isn't an issue that's subsumed in that finding. There were only two findings in Middleton 1. The first was that the South Bay trustees were trustees or fiduciaries of the security fund plan. The second issue was that they breached their fiduciary duty to the security fund plan by failing to use the surplus assets exclusively for the benefit of the security fund participants. And you could find a breach of the duty, but then you could also find that the plaintiffs could not recover because they were barred by the statute or Blatches or some other application. Yes, absolutely, Your Honor. Those are a part of it. But I think what confused Judge Reell was the language that, in the opinion, that says counsel for the participants has suggested that certain remedies other than the return of the surplus funds may be appropriate. Accordingly, we remand to the district court so that may determine the appropriate remedy, which kind of skips over that next step of do you have any defense, even if you're liable, do you have any defenses such as. That's absolutely right. Yeah, and I do think sometimes our mandates aren't as clear only because that's not an issue that really the court was thinking of. So I'm willing to assume that the district court erred on that. But tell me why you think these affirmative defenses are viable. Oh, all right. That's, I think, the reason why they're viable relates in part to the decision in Middleton 1 and its conclusion that the breach occurred because there was a failure to use the surplus assets exclusively for the benefit of the security of plain participants. The fact of the matter is that when you look at the facts and circumstances, they go all the way back to 1987. There was an agreement that allowed us to have those assets. And that agreement effectively. And you were commingling them and keeping the surplus all the time. Right. When did the bakery drivers' trustees discover that under 29 U.S.C. section 113, 11132, which would be three years after the earliest date in which the plaintiff had actual knowledge? Well, it seems like that they knew it when they asked for the money, and you wouldn't give it back. Well, it's true. I mean, they clearly knew it at that point. But they knew it before then. Well, they knew you were commingling. But does that mean that they know that they're not going to get the money back? Yeah. They knew that we were commingling, that we were treating it as our assets, not as their assets. The other very interesting part of this case is they were treating it as our assets and not their assets. Why would they? I mean, isn't the general rule that interest follows the principle applicable? Why wouldn't someone assume that what interest and how the money was growing would go to the original owners of it? Because you have to look at what this transaction was. This was an agreement whereby they agreed to pay us $5.50 per participant for a $10,000 benefit. And we provided the benefit, and we received the payments. And we received the payments, and they came into us. Okay, but it's behind you now. Your argument on that's behind you. Middleton 1 said it wasn't your money, the surplus. It's true, but the facts remain the same. And the facts are that those funds came into us. They treated them as expenses. In other words, they were out. They were expenses. They were out. They went to us. They never came to us and said you have to give the money back to us for the full 14 years of the trust-to-trust agreement. In fact, not for a year or a year and a half afterwards they didn't. They knew that we were a multi-employer plan using pool assets, and the pool assets included all assets being put in. They were used to pay out any expenses that we had. That's the operation, the basic operation of a multi-employer plan, and that we were doing that. Now, if we had those assets, we would have had an obligation, and they were their assets, to invest those assets and to provide accountings to them. They knew they weren't getting accountings. They knew they weren't getting investment proceeds. They knew all these things all the way throughout this proceeding. The point being that they knew the assets were not being used solely for the exclusive purpose of their participants. But wouldn't there be a point where now, obviously, I'm assuming if you had to pay out more judgments than there was money, then you would have had to use other money. They agreed for a certain amount, right? We would have used. So when your obligations stop to pay out, isn't that when they ask you back for the money? They didn't ask for money back for a year and a half after that, but that's the only time they did, yes. It didn't matter. We were in a position where we had to pay, and we did pay the benefits. We paid them from the total pool of assets that we had, just like we were paying other benefits from the total pool of assets we had. That pool of assets, including the so-called surplus funds, we also paid expenses from that pool of assets that were unrelated to the surplus funds. These were all common practices in the plan. And I think it's credible to take the position that they didn't know that those were going on, and somehow at the end of 14 years later they could say, oh, by the way, you owe me whatever surplus there is in the surplus paying back. It wasn't done. Your job wasn't done until all of what you owed under the agreement was paid out. So how could they know? I mean, how could they know both that there would be a surplus or that interest would be made until you said you wouldn't pay? Well, the surplus, Your Honor, was building from the very first month. But there was no way of knowing, right? Sure there was. No. How do you quantify what the ultimate debt benefits are going to be? We don't know how many people are going to, you know, if we knew that you called people in and said you're going to die, you're going to die, you're going to die, and so we know we're going to have this amount left. I mean, I think everyone's kind of hoping they're not going to die. I don't think we have to be clairvoyant, Your Honor. At the very worst, at the end of the first three-year agreement, they knew how much was paid in, they knew how much was paid out. They knew what the expenses were because the administrative expenses were primarily their plan administrator. All you had to do was do the math there and you knew what the surplus was. If they believed the surplus was their asset, which as fiduciaries, they would have an obligation to keep track of their own assets, they would have known right then and there. You're not asking them about having to guess what happens in the future. At that stage, there was a surplus of I think $300,000 or $400,000. I've listed in my brief exactly what it was. At the end of the next three years, that surplus had grown to something like $700,000 or $800,000. No demand for payment back or anything, but there it is, and everyone knows what it is and that we're using it. Three years later, now the surplus is over $1 million. Again, a new contract standard. None of the terms are changed or don't ask us to use any of that surplus to pay the new contributions going forward just to continue to grow. It's because they never treated them as their assets. They always treat it as our assets until the very end, but the fact is we also always treated that as our assets. We never held those surplus funds for the exclusive benefit of their participants, and therefore from the very beginning, if you accept the premise of the first appellate decision in this case, we were in breach of our fiduciary duty. That went all the way forward consistently, and if knowledge is the issue that you're having the most trouble with, I think all the facts and circumstances. It's discovery. I mean, discovery. Discovery. Right. That's really the issue. Right. I don't really see you in clean hands here, and latches is, you know, kind of relates to the same thing. I mean, we only have latches if you know of your rights and rest on them. So it's really the knowledge that your client was not going to give the plaintiffs back their share of the surplus. Your Honor, I've listed in the brief, and I've also talked to you what I think are the facts that put them on notice or knowledge of what the facts were with regard to these. The other thing I'd say in regard to that, if you for some reason believe the three-year statute isn't operative because of the knowledge issue, then certainly the six-year absolute statute is, and the best they could do is go back six years from the date of filing. And apportion that recovery. Apportion just that, but not back over 14 years of the agreement. But I do believe the three-year statute does bar this, but certainly the six-year statute bars anything six years and behind in that regard. All right. Thank you, counsel. You've gone well over your time. Thank you. Good morning, Your Honors. My name is David Sackman. For the appellees this time, since we've been up here twice in different capacities, I'll refer to them as South Bay and my clients are the bakery drivers. Those are the friends. It appears that this Court is moving towards finding that Judge Reel did err or not considering their affirmative defenses, so I won't dwell on that, except just briefly to note that this is one time he did exactly what this Court told him to do. So I don't think he should be held to account. What, you're saying the stop clock is right twice a day? Well, one of the cases they cite says the district court should not be reversed for failing to follow a mandate if its decision is within the scope of the remand, I think is fairly clear. Well, sometimes we don't do a great job on remands either. District court judges tell us that all the time. But why on the – you know, I'm inclined, even though – I mean, we obviously I can't speak for other people because we haven't discussed the case at this point. But assuming that the latches and the unclean hands, I'm inclined to say that the strongest would be the statute of limitations. What happened here? Did someone – I mean, if you knew that it was being commingled, did they get a new lawyer and then someone said, hey, we're entitled to the money back. Let's ask for it. All three of those affirmative defenses depend on determining what was the breach. That's the central question here. And – So what was the breach? The breach, as this Court stated the first time, was the failure to use these assets for the bakery drivers. During that entire 14-year period, they were doing exactly what they were supposed to be doing. They were using it to pay benefits, using it for administrative expenses, and holding the remainder in trust. That's exactly what they were required to do. That's exactly what the bakery drivers' trustees would have been required to do if they just held on to the money themselves. So that's why we had no complaint about any of that. Their argument is that just the mere act of commingling is a breach. And I would caution the Court to be very careful about going down that road. The cases they cite on this all involve cases taking assets out of the trust into someone else's account for some other purpose. That's not what we have here. All the money was kept in trust. What we have is one trust that happens to encompass different plans. And we never said there was anything wrong with that. We never said in our complaint. We never complained about it. And I would strenuously argue that that is not a breach. So if you had complained that that was the breach, an appellant might have a better argument on the statute of limitations, if that was sort of the gravamen of what you're complaining about. But what you're saying is when all was said and done, and the breach happened when you asked for your money back and they wouldn't give it to you. Exactly. And when you ask for the money and when they wouldn't give it back, is that date an undisputed fact? That's undisputed. All right. And that date falls within the statute of limitations. It was 2002, I believe, May, and we filed the complaint. May 2002, right? Exactly. And we filed the complaint one year after that. And, in fact, we found out later that they were, in fact, continuing to pay at least a couple of, or I believe three claims even after that. So arguably they were still doing what they were supposed to have done even after that. But what this court found was the breach was a failure, the failure to use this for the bakery drivers. It was an omission. And the omission under the statute does not accrue until the last act when they could have corrected that under Section 1113. That occurred when we asked them, these are our assets, we want to use it for the bakery drivers, give it back. And when they refused, when they made that decision, that was their last act. That was their last chance to do something about it. And that's when that occurred. But I would strenuously argue against finding just the mere act of commingling within one trust different plans as a fiduciary breach. Because although this case may be unique in its facts, the act of commingling in one trust different funds from different plans for different participants As long as you account for it. As long as you're accounting for each of the trusts, each of the separate funds, you're accounting for that and allocating what flows after that. You have to keep, you have to account for it, but you can commingle. Yeah. They have an obligation to account. So when they're asked to pay, they have to know what they can trace to the money. Right. And that's actually one of the remedies. Because it wouldn't be right for them to pay someone else's money. That would be a breach, right? Right. Well, by commingling, you know, technically they're mixing the money together and you can say in one sense they're using this one big pot of money to pay different for different people, different groups of participants. But they have to be able to account at some point for where it all is. And it would be to find that act itself, just the commingling of breach, would invalidate, make illegal a lot of common practices, which is unnecessary. The breach here, what was found by the court, was the failure to put the money back after this terminated. And in any event, again, I can't speak for anyone else, I think you're clearly right in the commingling argument. But the point is there's no facts here that show you failed to account. I mean, there's no argument about how much money you're owed, right? Now there isn't. I mean, you kept track. The accounts were kept. That's my point. There's not an argument here that, in fact, not only were the funds put in one big pot, but nobody kept a record of whose money was put where. Well, wasn't that why it went to the special master or something after that? I mean, what Judge Real did was said, okay, you are owed some money, and this is the amount that they said that you're owed. Now you've got to go to the special master, and everyone's got to, I don't want to deal with all, you know, he didn't want to deal with all that, but he had someone going through all of that. Exactly. What we knew was how much money we paid them, and we also knew how the benefits, the claims that were paid, and we knew the administrative expenses at least as to Southwest administrators, who was also our administrator and who was doing the administration of this. So that we knew. But there was additional administration costs they claimed that we did not know about. There was whatever interest that accrued, the profits from the money that we did not know about, and that's what the master really decided. And then the master would report back to Judge Real, and then he would ultimately set the amount after all that was. He ended up stipulating that the master was correct in his findings of fact on that. Even though we could have, you know, argued about it, we just agreed that those findings were correct. But in any event, there's no assertion that they didn't try to keep track of the money. That South Bay did not try to keep track of the money? No, that's not our assertion. No. All right. So if you're right in the commingling argument, that's the end of it, right? That should be. Yes. The breach occurred with the failure, and actually the master on Judge Real's orders, and as we alleged in the complaint, too, all the time, counted the interest, the profits from this money from the date of termination. And the statute, Section 1109A, provides that the fiduciaries, if they breach their duty, they're liable not only for whatever was taken, but their profits from that. And so I think it's significant that we dated that from the date of termination, not an earlier date. We did not try to seek any profits that came from 14 years that they had the money. All right. Well, thank you, counsel. Thank you. I think a couple of things are important. One is we never did account and track those funds, South Bay Trust, as a separate account for them or for their benefit. That was never done. The accounting that was done as an after-the-fact accounting, you know, based upon computing how many payments went in and what benefits were paid out, that was completely after-the-fact. The other thing is we're not only talking about co-enabling. We're talking about a use of those funds during the whole entire period for any purpose that South Bay applied those funds going back to 1987. So they use it to pay their expenses. They use it to pay benefits for other participants. They use it to invest. They have never accounted, and we never provided any investment return with regard to those funds. Now, if you take the premise that the breach is a failure to use those funds exclusively for the benefit of the South Bay participants, that's not a fiduciary act that can be turned on and turned off, and you can't say, okay, it's all right for you not to do that for the 14 years of the trust-to-trust agreements, but then at the end you breach the fiduciary duty by not giving the money back to us. A breach has to be occurring constantly throughout that period because you're violating the very premise of ERISA by not using the assets for the exclusive benefit of their participants. If these funds had been put into a separate account or something, their argument would make some sense, but they weren't. They were put into a combined account where all benefits were paid, all expenses were paid, investments were waived for the benefit of South Bay Trust, not for the benefit of security funds. All right. Thank you, counsel. Thank you. Thank you. Thank you.
judges: Sedwick, Wardlaw, Callahan